UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| APB Realty, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-cv-13142-LTS |
| | ) | |
| Georgia-Pacific LLC, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 87)
AND MOTION FOR SANCTIONS (DOC. NO. 92)

March 4, 2019

SOROKIN, J.

This case arises from a contract dispute in which plaintiff APB Realty, Inc. ("APB")

alleges it had a contract to purchase eighty-eight railroad cars from defendant Georgia-Pacific

LLC ("Georgia-Pacific"). Georgia-Pacific disputes that a contract was formed.

I.     BACKGROUND

On a motion to dismiss, another Session of this Court dismissed the sole remaining count

in the complaint, a breach of contract claim, on the grounds that no contract was ever formed

between APB and Georgia-Pacific. Doc. No. 58. On appeal, the First Circuit vacated, finding

that the complaint plausibly pled a breach of contract claim. APB Realty, Inc. v. Georgia-Pac.

LLC, 889 F.3d 26, 30 (1st Cir. 2018).[1] After remand, the case was reassigned to the

undersigned. Georgia-Pacific moved for summary judgment, Doc. No. 87, and for sanctions,

Doc. No. 92. APB opposed both motions. Docs. No. 95, 101.

---

[1] The First Circuit opinion also appears at Doc. No. 63.

The Court held a hearing on the pending motions for summary judgment and for sanctions on February 4, 2019. At the hearing, both parties agreed that the question of whether a contract was formed depends solely on the emails exchanged between the parties, submitted with the complaint and the motion for summary judgment. APB also cross-moved for summary judgment at the hearing. The parties agreed that the proceeding should be converted from a motion for summary judgment to a bench trial, whereby the undersigned would act as the finder of fact and would draw all reasonable inferences based on the evidence in the record. The Court confirmed several times the parties' understanding and agreement at the hearing. APB requested and received a seven-day period to determine whether it wished to submit any additional evidence for the Court to consider in resolving the question of whether a contract was formed. Georgia-Pacific would thereafter have two weeks to respond to any such evidence and to submit additional evidence, if it wished.

APB filed nothing within the seven-day period. Thereafter, the Court issued an order stating that it would take the matter under advisement and that "the factual record for the Court's decision will be the evidence submitted by the parties with respect to the motion for summary judgment." Doc. No. 106. To date, neither party has submitted any additional evidence or indicated an intent to do so. The Court, acting as the finder of fact, therefore decides the matter on the evidence submitted by the parties with respect to the motion for summary judgment. See Fed. R. Civ. P. 52 ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

II.     FINDINGS OF FACT

In April 2015, APB and Georgia-Pacific were involved in discussions concerning the sale of eighty-eight railroad cars by Georgia-Pacific to APB.  Doc. No. 97 ¶ 3.  APB intended to re-sell the cars to another company, Beasley Forest Products, Inc. ("Beasley").  Id. ¶ 4.  The communications between the parties happened primarily over email and, to a lesser extent, over the phone.  The substance of the dispute before the Court derives from the emails exchanged between the parties.

The following emails were attached to the Amended Complaint, Doc. No. 20, and were before the Court on the motion to dismiss and the First Circuit on appeal.

On April 24, 2015, Georgia-Pacific sent an email to APB, which read:

> please find attached a list of log rail cars that GP currently has for sale.  There are a total of 88 cars for sale.  78 are 50 year cars and 10 are 40 year cars.  This is a "where is, as is" sale for these cars.  The attached spreadsheet provides specific details for each car.  Please let me know if you have any interest or need any additional information.

Id. ¶ 7.  On June 24, 2015, Georgia-Pacific[2] sent APB another email "seeking to confirm the terms of an offer for the purchase of the railroad cars that APB had made earlier that day" via phone.  Id. ¶ 9.  The email read:

> Thank you for your call this morning.  I wanted to review my understanding of your offer for all of the railcars for GP.  Please review and confirm that I have understood your offer correctly.... Total for all 88 x Log Stake Railcars $1,636,000 (Including 16% Buyer's Premium).  Please respond with a confirmation so that I have something in writing detailing your offer.

---

[2] Sometime between the April 24, 2015 email and the June 24, 2015 email, Georgia-Pacific appointed a company named Liquidity Services as a broker for purposes of negotiating the sale. Doc. No. 97 ¶ 8.  The subsequent communications on behalf of Georgia-Pacific were sent by an employee of Liquidity, but for ease of reference, the Court refers to these communications as being sent by "Georgia-Pacific."  The parties agree that for purposes of determining whether a contract was formed, no further distinction need be made.

Id. ¶ 10.  APB did not respond to this email.  Id. ¶ 11.  On July 23, 2015, after further discussions

via phone between the parties, Georgia-Pacific sent APB the following email:

> Per our discussion yesterday, here are the schematics for the cars, that include the manufacturer information.  Our team has presented your offer to GP for final approval, and should have an answer by close of business tomorrow.  I'll let you know when final approval comes, and please don't hesitate to call if you should have any additional questions. One of Liquidity Services team members along with GP will coordinate transfers of all of the cars upon completion of the sale.

Id. ¶ 13.  The next day, on July 24, 2015, Georgia-Pacific sent APB a follow-up email, which

stated:

> Here are the two options that GP has brought back to close the deal on.
>
> Option 1, basically states that for $61K, you buy insurance that will replace as many Southern Wheels as needed to eliminate that problem.  GP will manage and take care of that issue.  So after any real costs, you are paying a small percentage as insurance against the number being larger than 51 wheel sets.  Option 2 is the deal with you taking responsibility for any Southern Wheels.
>
> Let me know which deal is best for you, and I'll get this closed out as early as possible next week.
>
> Option 1: Sale of the railcars (78 ea. 50 yr. Cars, 10 ea. 40 yr cars) As is, where is.  Georgia-Pacific assumes responsibility for the replacement of all southern wheels if found.  Customer retains responsibility for transportation to final destination. Proposed Offer: $1,697,000
>
> Option 2: Sale of the railcars (78 ea. 50 yr. Cars, 10 ea. 40 yr cars) As is, where is.  Customer assumes responsibility for the replacement of all southern wheels if found.  Customer retains responsibility for transportation to final destination. Proposed Offer: $1,636,000

Id. ¶ 17.  On July 27, 2015, APB replied to this email, saying: "we are leaning towards option 1,

should know this afternoon.  The 45+/- cars still come with the free move as well, correct?"  Id.

¶ 20.  Georgia-Pacific responded, saying: "Yes, [APB], These cars still come with the free

moves."  Id. ¶ 24.  The following day, on July 28, 2015, Georgia-Pacific sent APB an email

which stated:

Yesterday we received and GP accepted an offer to sell all 88 railcars, which was substantially higher than yours. This offer has been processed, and we expect to close on it shortly. If this high offer does not close we will come back to you and see if you have a further offer for these cars.

Doc. No. 95-1 at 46.

On appeal, the First Circuit determined, based on a review of the foregoing emails, that the complaint (including the attached emails) "alleges facts from which we can plausibly infer the making and breaking of a contract." APB Realty, 889 F.3d at 30. In discussing APB's offer to purchase the cars in conjunction with the July 24 email in which Georgia-Pacific proposed two options, the First Circuit held that

one could reasonably interpret Georgia-Pacific's email as unequivocally saying, in essence: "We accept your offer to buy the cars, as is, at your offering price. At your election, we will also repair a Southern Wheel problem for an additional $61,000." Under such a reading, there would be a contract pursuant to the originally offered terms and an offer to modify the contract if APB so desired and agreed.

Id. at 29.

Georgia-Pacific moved for summary judgment based on its assertion that another email, not before the First Circuit because it was not attached to the complaint, "conclusively establishes that APB and [Georgia-Pacific] merely engaged in negotiations, . . . that the Parties never reached a meeting of the minds as to the material terms of the contemplated agreement," and "that neither party expressed a present intention to be bound by the material terms that the Parties were then negotiating." Doc. No. 88 at 7. Approximately two hours after Georgia-Pacific sent the email which confirmed that the "cars still come with the free moves," Doc. No. 97 ¶ 24, APB replied by email ("July 27 reply"). The July 27 reply states: "once they [Beasley] agree to the counter, please expedite the P&S Agreement to me. We would like to close within 5 days...." Id. ¶ 29.

5

Georgia-Pacific argues that this response clearly demonstrates that the parties had not yet reached an agreement because APB understood that Georgia-Pacific's July 24 email was a counteroffer, rather than an acceptance of APB's original offer. Doc. No. 88 at 13. Additionally, Georgia-Pacific argues that the July 27 reply demonstrated APB's perception of two prerequisites to acceptance of the offer: the need to obtain the approval of Beasley and the existence of a definitive written agreement. Id.

APB, on the other hand, argues that a contract was formed on July 24 when Georgia-Pacific sent the email listing the two offers. Under APB's reading, in the July 24 email, Georgia-Pacific accepted APB's offer to purchase the cars for $1,636,000 by including "Option 2," and proposed a modification to the then-existing contract by including "Option 1."

III.    LEGAL STANDARD

The First Circuit has "stated that ordinarily the question of whether a contract has been made is for the jury, except where the words and actions that allegedly formed a contract are so clear themselves that reasonable people could not differ over their meaning." McGurn v. Bell Microproducts, Inc., 284 F.3d 86, 93 (1st Cir. 2002) (internal quotation marks and citations omitted). "When . . . the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Id. (internal quotation marks and citation omitted). However, "where the evidentiary foundation for determining the formation of the parties' contract is either undisputed or consists of writings, contract formation is instead a question of law for the court." TLT Const. Corp. v. RI, Inc., 484 F.3d 130, 135 (1st Cir. 2007).

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to

be bound by that agreement." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). "Although mutual assent is often misleadingly referred to as a 'meeting of the minds,' the formation of a valid contract under Massachusetts law requires objective, not subjective, intent." Greene v. Ablon, 794 F.3d 133, 147 (1st Cir. 2015). Therefore, "[a] party's intent is deemed to be what a reasonable man in the position of the other party would conclude his objective manifestations to mean," and may be inferred from the party's conduct. Id. (internal quotation marks and citation omitted).

Additionally, "the parties' intention to execute a final written agreement justifies a strong inference that the parties do not intend to be bound until the agreement is executed." Situation Mgmt. Sys., 430 Mass. at 879–80 (internal quotation marks and citation omitted). However, if the parties have reached agreement with regard to the material terms, "it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract." Id. at 880.

IV.    CONCLUSIONS OF LAW AND FURTHER FINDINGS OF FACT

APB has failed to establish by a preponderance of the evidence that the parties reached agreement on the material terms of the contract and manifested an objective intent to be bound.

First, the Court infers and concludes that in the course of negotiations, as reflected in the emails, that for Georgia-Pacific, APB's acknowledgement of the existence of Southern Wheels was a material term. In order for Georgia-Pacific to be bound, it was requiring that APB either purchase insurance against the possibility that more than 51 Southern Wheel sets were on the rail cars (option 1) or expressly acknowledge that APB would take responsibility for the Southern Wheels (option 2). Doc. No. 97 ¶ 17. Therefore, based on the record, the Court concludes that as of the July 24 email proposing these two options, Georgia-Pacific had decided it wanted responsibility for Southern Wheels to be an express term of any agreement and that it was

7

unwilling to rest on an "as is" provision.  APB never affirmatively agreed to either option.

Therefore, there was no "agreement between the parties on the material terms of that contract."

Situation Mgmt. Sys., 430 Mass. at 878.

Second, after reading the emails and drawing the reasonable inferences therefrom, the

Court declines to draw the inference that APB manifested an intent to be bound at any point

during the email discussions.  For the reasons stated above, APB has not met its burden to prove

by a preponderance of the evidence that Georgia-Pacific's July 24 email accepted a prior offer

from APB and offered a possible modification.  There is no email authored by APB in which

they state an intention to be bound to purchase the rail cars from Georgia-Pacific for a set price.

The first email from APB states only that APB was "leaning towards option 1," that it hoped to

let Georgia-Pacific know its final answer later that day, and that it wanted to confirm that some

of the cars came with "the free move as well."  Doc. No. 97 ¶ 20.  This email is not sufficient to

establish by a preponderance of the evidence that APB had already manifested an objective

intention to be bound to the purchase of the cars.  In fact, APB's statement that it was "leaning

towards option 1" indicates to a reasonable person that it had not yet made up its mind about the

terms to which it was willing to be bound.

One additional point bears discussion.  Georgia-Pacific relies heavily on its "recent

discovery" of the July 27 reply from APB to Georgia-Pacific which used the word "counter."

Doc. No. 88 at 7.  Georgia-Pacific argues that this single email "conclusively establishes that

APB and [Georgia-Pacific] merely engaged in negotiations, and that the Parties never reached a

meeting of the minds as to the material terms of the contemplated agreement."  Id.  This

argument fails primarily because use of the word "counter" is not definitive proof that no

contract was formed.

"[S]ince the formation of informal contracts depends not upon an actual subjective meeting of the minds, but instead upon outward, objective manifestations of assent, an actual intention to accept is unimportant except in those situations when the acts or words of the offeree are ambiguous." 2 Williston on Contracts § 6:3 (4th ed.).  Therefore, whether APB viewed the proposal of two options by Georgia-Pacific as a counteroffer is not dispositive in determining whether a contract was formed.  Based on the interpretation offered by the First Circuit and now advanced by APB, if a contract was formed, it was formed at the time of Georgia-Pacific's July 24 email (though for the reasons previously discussed, no contract was formed by that email).  A single email three days later which uses the word "counter" and discusses a purchase and sale agreement would not change that fact.  Neither party is arguing that a contract was formed by APB's acceptance of an offer made by Georgia-Pacific.[3]

For these reasons, the Court finds that the parties did not reach a mutual agreement over the material terms of an agreement, and thus no contract was formed between APB and Georgia-Pacific by the July 24 email or at any other point in time.  The fact that APB used the word "counter" to describe Georgia-Pacific's July 24 email lends support to this view, though it is not dispositive.  Accordingly, Georgia-Pacific's motion for summary judgment, now a motion for judgment after this bench trial, is ALLOWED.  APB's cross-motion for judgment is DENIED.

---

[3] In support of its opposition to the motion for summary judgment, APB submitted the affidavit of Kirk Bryant, the individual emailing with Georgia-Pacific on behalf of APB.  Doc. No. 95-4 at 63.  To the extent that the subjective intention of the parties is relevant in this case, Mr. Bryant's affidavit provides some insight into his subjective intent.  For example, he states that "[b]y Monday afternoon, July 27, 2015, I had believed that the contract and the agreement had been reached between APB and Georgia-Pacific . . . We had agreed on the cars, the number of cars and the price."  Id. ¶ 5.  He also states, "[a]ny reference I would have made on Monday afternoon to any 'counter' would have been relating just to the separate issue about the wheels and any costs that might be related thereto."  Id. ¶ 6.  The Court finds this affidavit neither dispositive nor necessary to the resolution of this matter.

V.    SANCTIONS

Georgia-Pacific also moved for sanctions, Doc. No. 92, under two theories. First, Georgia-Pacific asserts that "APB and its counsel violated Rule 11(b)(3) by deliberately misleading this Court" when it failed to include the July 27 reply from APB which used the word "counter." Doc. No. 93 at 8. Second, Georgia-Pacific asserts that "APB doubled down on its deceptive omission and affirmatively mislead [sic] this Court" by stating in is opposition to the motion to dismiss that "the parties did not expect some later signed written agreement. There is no evidence in the record to support that." Id. The Court addresses each of these two theories in turn.

> First, the Court notes that Rule 11(b) of the Federal Rules of Civil Procedure states:
>
> By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(3). As to Georgia-Pacific's first theory, no misrepresentation was made to the Court by not including the July 27 reply with the complaint. A plaintiff has no obligation to attach any evidentiary documents to its complaint or to plead every single fact, whether helpful or not, in its complaint. Additionally, as previously discussed, the Court finds that the July 27 reply had minimal relevance on the only legal question – whether a contract was formed between the parties. The July 27 reply certainly was not dispositive, as Georgia-Pacific suggests, and has only minimal relevance as to APB's subjective intention, which is not even an element of contract formation. Accordingly, sanctions are not warranted under the theory that APB misled the Court by not including the July 27 reply in the chain of emails attached to its complaint.

10

Georgia-Pacific's second theory, that counsel for APB, Attorney D'Amico, affirmatively misled the Court in his opposition to the motion to dismiss, fails for similar reasons. The context of the statement made by Attorney D'Amico in the opposition sheds some light on the issue. The statement in question appears in a section where he discusses whether the lack of a final written agreement can preclude the formation of a binding contract. He states: "Here, the parties did not expect some later signed written agreement. There is no evidence in the record to support that." Doc. No. 57 ¶ 30.

This statement, though Georgia-Pacific may disagree with it, is not a factual contention completely lacking in evidentiary support. For one, the July 27 reply, even if read to suggest that APB expected a later written agreement, was not in the record at the time Attorney D'Amico made this statement. Second, assuming without deciding that Attorney D'Amico knew about the July 27 reply at the time he made this statement, the statement may fairly be read as a legal argument interpreting the emails in the context of the law. As the Court understands it, APB's position is, and has been, that a contract was formed between the parties at the time Georgia-Pacific sent the July 24 email with two options. Even accepting that the July 27 reply indicated APB's expectation that a purchase and sale agreement would later be completed, Attorney D'Amico's statement may fairly be read as an argument that there is no evidence the parties expected a later written agreement in such a way that it precluded a contract from being formed.

Accordingly, the motion for sanctions, Doc. No. 92, is DENIED.

## VI.    CONCLUSION

For the foregoing reasons, the parties' pending motions for summary judgment are converted to motions for judgment after this bench trial. APB's motion for judgment after this

bench trial is DENIED.  Georgia-Pacific's motion for judgment after this bench trial, Doc. No.

87, is ALLOWED.

The motion for sanctions, Doc. No. 92, is DENIED.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge